UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRIAN FARLEY,                              )
                                           )        No. 14 C 9810
            PLAINTIFF-APPELLANT,           )
                                           )
    v.                                     )        Judge Thomas M. Durkin
                                           )
MARGARET KEMPFF,                           )
                                           )
            DEFENDANT-APPELLEE.            )

## MEMORANDUM OPINION AND ORDER

Plaintiff-appellant Brian Farley has appealed the bankruptcy court's judgment in favor of defendant-appellee Margaret Kempff ("Kempff," or "Margaret") on Farley's adversary complaint challenging Kempff's Chapter 7 discharge under 11 U.S.C. § 727(a)(2) and (a)(4). Farley argues that the bankruptcy court erred in finding that Kempff did not intentionally or recklessly (1) transfer property while her Chapter 7 petition was pending without the bankruptcy court's permission; and (2) file materially false bankruptcy schedules. For the following reasons, the Court affirms the bankruptcy court's judgment.[1]

---

[1] Farley argued in his opening brief that the bankruptcy court lacked jurisdiction to modify its judgment to award costs to Kempff under Federal Rule of Bankruptcy Procedure 7054. *See* R. 13 at 11-12; *see also* R. 17-3 (order amending judgment). The Court disagrees. *See In re Patel*, Nos. 13 C 103, 13 C 657, 2013 WL 2151547, at *5 (N.D. Ill. May 15, 2013) (a bankruptcy court has jurisdiction to award costs under Rule 7054 after appellant has filed a notice of appeal).

1

## I. Kempff's Alleged Debt to Farley

Margaret's ex-husband, Bart Kempff ("Bart"), stole more than $1 million from the company where he worked as an in-house attorney. R. 18-1 at 4. In an attempt to replenish the money that he had stolen, Bart obtained a $400,000 loan from Farley, ostensibly to acquire real estate that Bart intended to develop. *Id.* at 4-5. As security for the loan, Bart promised to give Farley a security interest in the investment property and a second mortgage on the home that Bart shared with Margaret. *Id.* at 5. After Bart signed a note and mortgage naming Bart and Margaret as promisors/mortgagors, Farely gave Bart a check for $400,000, which Bart then transferred to his employer's accounts in $100,000 increments over the next several days. *Id.* at 6. Bart told Farley that Margaret was aware that she needed to sign the note and the mortgage, and promised Farley that he would obtain her signature. *Id.* In fact, he had not told Margaret about those documents. *Id.*

Before Bart returned fully-executed copies of the documents to Farley, he and Margaret obtained a bank loan secured by a second mortgage on their home. *Id.* Two days after that loan closed, Bart forged Margaret's signature on the note and mortgage and returned the documents to Farley. *Id.* at 8-9. Farley then recorded the mortgage, which at that point was third in order of priority. *Id.* at 11.

---

[2] Except as otherwise indicated, the following facts are drawn from the bankruptcy court's findings after a three-day trial. *See* R. 18-1. Farley objects to the bankruptcy court's ultimate conclusion that Kempff did not intend to defraud her creditors, but generally does not challenge particular factual findings.

The first mortgagee later filed a foreclosure complaint against the Kempffs, naming the second mortgagee and Farley as additional defendants. *Id*. at 12. Farley filed cross-claims against Margaret and Bart for fraud and breach of contract, obtaining an $840,000 judgment against Bart. *Id*. The state court stayed Farley's cross-claims against Margaret after she filed her bankruptcy petition in March 2012. *Id*.

After Farley conducted Rule 2004 examinations of Kempff and her parents, he filed an adversary complaint against Margaret challenging her discharge under 11 U.S.C. §§ 523 and 727. *Id*.; *see also* Fed. R. Bankr. P. 2004(a) (authorizing the bankruptcy court to order the examination of a party "[o]n motion of any party in interest"). After a three-day bench trial, the bankruptcy court read into the record extensive findings of fact and conclusions of law, ruling in Margaret's favor on all of Farley's claims. *See* R. 18-1.[3]

## II. Alleged False Statements and Material Omissions In Kempff's Bankruptcy Schedules

### A. 11 U.S.C. § 727(a)(4)(A)

Farley claims that Margaret violated 11 U.S.C. § 727(a)(4)(A), which bars discharge to debtors who knowingly and fraudulently make a "false oath or account" "in or in connection with" the bankruptcy case. In support of this claim, Farley cites several inaccuracies in Margaret's original and amended bankruptcy schedules.

---

[3] Farley has not appealed the bankruptcy court's judgment in Margaret's favor on his § 523 claim, in which he claimed that Margaret's debt to him was not dischargeable because it was fraudulent. R. 18-1 at 13.

### 1. The Kempffs' Judgment of Marriage Dissolution & Marital Settlement Agreement

In Margaret's original Schedule B (listing her personal property), she checked "None" beside the space reserved for "[a]limony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars." R. 20-4 at 15. She again checked "None" beside this category in her amended Schedule B, filed January 10, 2013. R. 21-1 at 3. She did, however, disclose "[c]laims against ex-husband Bart Kempff, pursuant to Judgment of Marriage Dissolution" in the space reserved for "[o]ther contingent and unliquidated claims of every nature . . . ." *Id*. She estimated that the value of those claims was "0.00." *Id*. The *amount* of Bart's obligation to Margaret, which came to light at trial, was more than $300,000. R. 18-1 at 49. The parties' Marital Settlement Agreement, attached to the Judgment of Marriage Dissolution, also obligated Bart to indemnify Margaret for certain obligations, including debts to her parents and to Farley. *Id.*; *see also* R. 22-2 at 11.

The bankruptcy court credited Margaret's testimony that she did not include the divorce settlement in her original schedules because Bart had "not paid one cent of the amount that he owes" and that she had "no expectation of ever receiving anything from him." R. 18-1 at 48; *see also id*. at 50 ("Margaret testified credibly that she originally did not list amounts owed . . . by Bart to her because she had never received any payments and believed that she would never receive any payments and so, therefore, she felt the value of the obligations was zero."). While she should have disclosed the divorce settlement, the court concluded that the omission was immaterial and that she had not intended to deceive her creditors:

> The court finds that she honestly believed the agreement was worthless and uncollectible and honestly didn't even think of it as an asset. While she should have disclosed the obligations and listed their value as zero, her failure to list was not a material omission and was not made with intent to deceive.

*Id*. at 53.

The bankruptcy court further concluded that her amended Schedule B was not false. *See id*. at 51 ("[T]he value of the claims at zero is a fair reflection of not only Margaret's belief about the value of the claims at the time, but the court's estimation of those values as well based on the evidence presented here."). Bart, a disbarred attorney and convicted felon, had dim economic prospects. *Id*. The court found Bart's testimony that he planned to pay Margaret "at some point in the future . . . utterly unbelievable." *Id*. at 51; *see also id*. at 36 ("The court also finds that Bart was not a credible witness. He is not only a convicted felon for stealing funds, he's admitted to defrauding Farley, and he was obviously lying throughout this proceedings.").[4] It also rejected Farley's suggestion that the Chapter 7 trustee "could have sold those obligations to someone," citing the lack of evidence supporting that possibility and the court's own experience: "in my 15 years on the bankruptcy bench, having presided over thousands of Chapter 7 cases, not one Chapter 7 trustee has ever attempted to sell an obligation in a consumer case." *Id*.

---

[4] The bankruptcy court concluded that Bart, who testified at trial, "went out of his way to try to ensure that Margaret would be denied a discharge" in the "hope that Margaret's family who appear to have some wealth and who paid large sums to keep him out of jail in 2007, will step in once again and pay the debt he owes to Farley." R. 18-1 at 37. Margaret speculates that Farley is motivated by the same hope. R. 23 at 7 ("This case is about Farley's effort to harass Margaret's parents into paying Farley for a debt owed to him and fraudulently procured by Margret's ex-husband.").

at 53. The court stated that Margaret should have listed the Marriage Settlement Agreement in the "property settlement" category, and provided more detail about Bart's obligations, but that her failure to do so did "not make the amended Schedule B false." *Id.*

## 2. Margaret's Clothing and Jewelry

Also in her Schedule B (original and amended), Margaret valued her "necessary wearing apparel and costume jewelry" at $500. R. 20-4 at 15; R. 21-1 at 2. Farley argues that Kempff admitted that the jewelry alone was worth $500, which by implication means that she valued her clothing at $0. *See* R. 13 at 23. According to Farley, her clothes must have had some value because she disclosed in her 2009 divorce case that she spent $200 a month on clothing. *Id.* The brief snippet of the record Farley cites regarding Kempff's purported admission is vague:

> A. . . . worth. I've told you I don't know. I would say that is a very high guess. I was told to put down on my bankruptcy as though it would be resale, what would be the resale of it. The value of my jewelry was $500.
>
> Q. The value of your jewelry alone?
>
> A. Filing my bankruptcy, I wrote $500. Talking with my bankruptcy attorney, he said what would this be to somebody who is going to resell it? $500. That's the amount we came up with.
>
> Q. That doesn't include your clothes, does it?
>
> A. You didn't ask me about my clothes. You asked me about jewelry.

R. 19-2 at 8. The bankruptcy court held that Farley had not satisfied his burden to show that the $500 valuation was false and that Margaret had intended to defraud her creditors:

There is no evidence at all about the value of the clothing. There is no credible evidence about the value of any jewelry owned on the petition date. Farley has failed to carry his burden with respect to either— either of those types of items. He's produced no insurance policy, not appraisals, and he [chose] not to inspect or have any jewelry that she owned valued by a qualified expert. The court finds that the debtor's estimate of the value of her jewelry and clothing was not false. Farley also failed to establish that she had any fraudulent intent with respect to the value placed on the jewelry and clothing.

R. 18-1 at 41.

### 3.     Gifts from Margaret's Parents

In her original Schedule I ("Current Income"), Margaret listed "[g]ifts from parents" in the amount of $2,000 in the category "[o]ther monthly income." R. 20-4 at 25. In fact, her parents were providing her and her children approximately $4,500 a month. R. 18-1 at 59-60. The bankruptcy court suggested that the discrepancy may have been attributable to the fact that Margaret had included cash and check gifts from her parents, but did not include charges that she made to the credit card her parents allowed her to use. *See id.* at 61 ("It appears that Margaret may have been including an estimate of the cash given to her or paid in checks on her behalf since she referred to checks in her testimony, not the amounts she charged on the cards, in adding up the income that she thought she needed to disclose."). The court concluded that Margaret's mistake was reasonable: "[a] lay person without expertise in bankruptcy would not necessarily think that charges made on somebody else's charge card should be included as income." *Id.* at 60. Moreover, the court concluded that she had no motive to underreport the value of the gifts she received from her parents because they "would not have put her

anywhere close to the level at which . . . there could be even a potential argument that she should not get a discharge under the means test pursuant to Section 707." *Id*. at 61-62; *see also* 11 U.S.C. § 707(b)(2). Unlike the typical § 727(a)(4)(A) case, in which a debtor attempts to hide the true value of property that creditors might seize, the gifts Margaret received from her parents were not property of the estate and could not "be taken to pay any creditor." R. 18-1 at 63. Finally, the court rejected Farley's argument that her failure to amend her Schedule I to reflect the higher number supported Farley's argument that she was trying to deceive her creditors:

> Margaret had no way of knowing what amendments would be required based on case law concerning what should be included in income in the bankruptcy schedules or the statement of financial affairs. [Her attorney's] failure to suggest the amendments either reflects a misunderstanding by him of what should be included in income or utter incompetence in not realizing that any errors in the schedules should be corrected as soon as possible. Either way, his error does not reflect an intent by Margaret to deceive in failing to correct the schedules.

*Id*. at 64.

### 4.    Inaccurate Payment Amount to Margaret's Parents

Margaret's amended Statement of Financial Affairs listed a $275.35 payment to her parents in the category for "all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders." R. 21-1 at 8. The actual amount of the transfer was $3,275.35. R. 18-1 at 65. The bankruptcy court concluded that the lower figure was "a simple typographical error made without any intent to deceive, it was not material to the

case, and that the transfer was not required to be disclosed in the first place because it was before the one-year period covered by the question." *Id.*

### B.        11 U.S.C. § 727(a)(4)(B)

Farley claims that Margaret also violated 11 U.S.C. § 727(a)(4)(B), which bars discharge to debtors who present "false claims." Margaret amended her Schedule F ("Creditors Holding Unsecured Nonpriority Claims") to disclose a $1.4 million debt owed to her parents. R. 21-1 at 6. The bankruptcy court concluded as a matter of law that scheduling a debt does not constitute making a "claim" under § 727(a)(4)(B). R. 18-1 at 68-69 (citing *In re Rosenzweig*, Nos. 97 B 38192 and 98A 01434, 1999 WL 569446, at *8 (N.D. Ill. Bankr. July 12, 1999)).

The bankruptcy court went on to reject Farley's theory that Margaret added the debt she owed to her parents to create the impression that Farley's share of any assets in the estate was less than it really was. *Id.* at 68. Before and during trial, Margaret and her parents consistently testified that they believed the debt was a moral—not legal—obligation. *Id.* at 67. Farley was Margaret's "only real creditor," and he was the one "who had in fact taken the 2004 exams that led to the statements of moral but not legal obligations." *Id.* Also, her amended schedule was correct insofar as it disclosed "an uncontested amount that [Margaret's parents] did in fact pay to Margaret and her spouse." *Id.*

The bankruptcy court attributed the amendment to "the inexplicable and I will say incompetent advice" of her attorney. *Id.*; *see also id.* ("She would have no reason to think that she should add them as creditors, particularly after she just

acknowledged that there was no legal obligation to pay them."). The court rejected Farley's argument that Margaret had waived her "advice of counsel" defense by not raising it as an affirmative defense in response to Bart's adversary complaint. *Id.* at 71. The court held that advice of counsel "is 'a species of evidence' that can be offered to negate the element of intent," not an affirmative defense. *Id.* (quoting *In re Gotwald*, 488 B.R. 854, 872 (E.D. Pa. Bkr. 2013)).

Finally, the court concluded that the amendment was immaterial because there were no assets in the estate to pay creditors. *Id.* at 67.

## III. Property Transferred During the Pendency of Margaret's Bankruptcy Case

Section 727(a)(2) bars discharge for debtors who, "with intent to hinder, delay, or defraud" a creditor, transfer property of the estate "after the date of the filing of the petition." 11 U.S.C. § 727(a)(2). Farley claims that Margaret fraudulently transferred approximately $7,200 to the Illinois Department of Revenue ("IDOR") while her bankruptcy petition was pending. R. 18-1 at 26.

The transfer at issue involved stock that Margaret owned in Steel Investment Company, a business owned primarily by certain members of her mother's family. *Id.* at 27. At some point before Margaret filed for bankruptcy, the IDOR imposed a levy for unpaid taxes on the stock, *id.* at 29, which at that point had been pledged to her uncle as security for a loan he had given Margaret in the wake of Bart's fraud. *Id.* at 28. (Margaret had also ceded control over any income from the stock to her father in return for the financial support her parents had given her. *Id.*) After Margaret filed for bankruptcy, her attorney notified the IDOR that the automatic

stay prohibited it from enforcing the levy. *Id*. Richard Schoon, who served as an accountant for Steel Investment and certain members of Kempff's family (including Margaret), also received a copy of the letter. R. 9 at 347, 355 (trial testimony of Richard Schoon). In June 2012, after consulting with Steel Investment's attorney, Schoon transferred a $7,200 distribution on Margaret's stock to the IDOR. *Id*.; *see also* R. 9 at 347. Margaret "never instructed [Schoon] one way or the other to do anything with the levy" and she had no involvement at all in Schoon's discussions with the company's attorney. R. 9 at 364-65.

The bankruptcy court concluded that there was no evidence that Margaret played any role in the accountant's decision to release the distribution to IDOR. R. 18-1 at 31. "She, therefore, did nothing with respect to the transfer with the requisite intent to hinder, delay or defraud anyone." *Id*.

### Legal Standard

The Court reviews the bankruptcy court's conclusions of law, and mixed questions of law and fact, *de novo*. *Stamat v. Neary*, 635 F.3d 974, 979 (7th Cir. 2011); *see also In re Ebbler Furniture and Appliances, Inc.*, 804 F.2d 87, 89 (7th Cir. 1986) ("The factual determinations are subject to the clearly erroneous standard; but the manner in which these factual conclusions implicate the legal definition of value is subject to a de novo review."). The Court will not reverse the bankruptcy court's factual findings unless they were clearly erroneous, *id.*, giving "'due regard . . . to the opportunity of the bankruptcy court to judge the credibility of the witnesses.'" *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004) (quoting Fed. R.

Bankr. P. 8013). "Whether a debtor possessed the requisite intent to defraud is a question of fact, which is subject to the 'clearly erroneous' standard of review." *In re Marcus-Rehtmeyer*, 784 F.3d 430, 436 (7th Cir. 2015).

**ANALYSIS**

The "fresh start" that Chapter 7 gives to debtors is "reserved for the 'honest but unfortunate debtor.'" *Stamat*, 635 F.3d at 978 (quoting *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991)). To that end, § 727 of the Bankruptcy Code "lists several exceptions that deny the privilege of discharge to dishonest debtors." *Id*. "In bankruptcy, exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor." *Id*. at 979 (citations and internal quotation marks omitted).

## I. Farley's § 727(a)(2) Claim

Farley has not challenged any of the specific factual findings underpinning the bankruptcy court's conclusion that Kempff was not involved in Schoon's decision to transfer $7,200 to the IDOR. *See* R. 13 at 51-52. He argues instead that Kempff acted recklessly because she did not tell her accountant explicitly *not* to pay the IDOR. *Id*. at 51. There is no evidence, however, suggesting that she should have anticipated Schoon's decision to release the distribution to the IDOR. He did not consult Kempff, who had no opportunity to stop the transfer. Kempff plainly did not intend to hinder, delay, or defraud anyone. The Court affirms the bankruptcy court's judgment in Kempff's favor on Farley's § 727(a)(2) claim.

## II.     Farley's 11 U.S.C. § 727(a)(4) Claims

In order to prevail on his § 727(a)(4) claims, Farley "must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Stamat*, 635 F.3d at 978. As the bankruptcy court noted, *see* R. 18-1 at 33-34, "a showing of reckless disregard for the truth is sufficient to prove fraudulent intent." *Id.*; *see also In re Katsman*, 771 F.3d 1048, 1050 (7th Cir. 2014); *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998); *In re Duncan*, 562 F.3d 688, 695 (5th Cir. 2009) ("Circumstantial evidence may be used to prove fraudulent intent . . . and the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent . . . ." (citation and internal quotation marks omitted)).

As a threshold matter, the Court rejects Farley's characterization of the bankruptcy court's ruling as being based predominately on the fact that there were no assets in the estate. *See* R. 13 at 27-29. The fact that Kempff's bankruptcy was a "no-asset case" was one factor that the court considered with respect one element of Farley's § 727(a)(4) claims (materiality). As the Court discusses below, the bankruptcy court specifically found with respect to each alleged misstatement and omission that Kempff had not intended to defraud her creditors.

### A.     11 U.S.C. § 724(a)(4)(A)

#### 1.     The Kempffs' Divorce Settlement

The bankruptcy court acknowledged that Kempff should have disclosed the divorce settlement in her initial disclosures, even if she believed that the settlement was uncollectable. *See* 18-1 at 53; *see also Beggs v. Moors*, 63 F.2d 70, 71 (7th Cir. 1933) (case cited by Farley for the proposition that a debtor must disclose the particulars of his or her assets and let the court decide their value and whether they belong to the estate). The question under § 727(a)(4), however, is whether she intended to deceive her creditors by omitting that asset. The bankruptcy court credited Kempff's testimony that she initially did not disclose the judgment because she thought it was worthless, *see* R. 18-1 at 53, and its credibility determination is entitled to deference. *See Mungo*, 355 F.3d at 974. Farley speculates that the settlement is "potentially valuable," *see* R. 13 at 43, but he has not even attempted to refute the specific grounds the bankruptcy court cited to support its finding that the settlement is worthless. The fact that her amended Schedule B incorrectly disclosed the settlement in the catchall category, rather than in the category reserved for alimony and related property settlements, does not support the inference that she intended to deceive her creditors. She did omit the *amount* of the judgment, which is at least consistent with Farley's theory that Kempff was trying to hide this asset from her creditors. But given the bankruptcy court's conclusions that Kempff testified credibly about her reasons for omitting the settlement, and

accurately disclosed its real value, its conclusion that Kempff did not intend to deceive her creditors was not clear error.

### 2.     Underreporting Gifts from Her Parents

It is undisputed that Kempff underreported the value of gifts that she received on a monthly basis from her parents. The bankruptcy court found, however, that Kempff credibly testified that she sat down with her bankruptcy attorney and arrived at a good-faith estimate "using various checks and other information that she had." R. 18-1 at 60. She evidently did not disclose charges that she made on her parents' credit card, and the bankruptcy court reasonably concluded that a "lay person without expertise in bankruptcy would not necessarily think that" those charges were income. *Id.* While she should have amended her bankruptcy schedules to reflect the correct amount, Farley has not challenged the bankruptcy court's conclusion that the correct figure would not have impacted her eligibility for discharge. *Id.* at 60-61. And as the bankruptcy court pointed out, the unreported gifts were not property of the bankruptcy estate available to creditors. *Id.* at 61-62. Thus, she had nothing to gain by underreporting the money that she received from her parents.

### 3.     Jewelry and Clothes

Farley argues that Kempff falsely reported the value of her "necessary wearing apparel and costume jewelry" at $500. As the Court previously discussed, it is unclear whether Kempff actually contradicted her disclosure at trial. Even if she did, the bankruptcy court properly held that Farley had not satisfied his burden to

show that the actual value of the clothes differed materially from Kempff's disclosure. Her clothing budget in 2009—the year she filed for divorce—does not establish the value of her clothes three years later.

### 4. The Amount of Kempff's Payment to Her Parents

Kempff disclosed a $275.35 transfer to her parents, when the correct amount was $3,275.35. Farley has not cited any evidence undermining the bankruptcy court's conclusion that this was simply typographical error. Also, Farley has not challenged the bankruptcy court's conclusion that Kempff had unnecessarily reported the payment because it occurred before the one year-period covered by the schedule.

### B. 11 U.S.C. § 724(a)(4)(B)

### 1. "Advice of Counsel" is not an affirmative defense.

Farley contends that in its ruling on his § 724(a)(4)(B) claim, the bankruptcy court improperly considered Kempff's testimony that her attorney advised her to add her parents as creditors to her amended schedules. He cites *In re Arlington*, 192 B.R. 494 (N.D. Ill. Bankr. 1996) for the proposition that advice of counsel is an affirmative defense and that Kempff waived the defense by not pleading it in response to Farley's adversary complaint. The debtor in *Arlington* was sanctioned for filing a lawsuit against her ex-husband without making a reasonable factual inquiry. *Id.* at 497. The bankruptcy court held that her obligation to pay the sanctions award to her ex-husband was not dischargeable under 11 U.S.C. §

523(a)(6). *Id.* at 500. In doing so, the court rejected the debtor's advice-of-counsel defense:

> The Sanctions Order expressly found that Mary violated the applicable rule by failing to make a reasonable inquiry into the factual basis of the personal injury suit before filing same. The Court is not willing to functionally eviscerate the Sanctions Order. Furthermore, if Congress had intended to provide debtors with an affirmative defense based on the advice of their attorneys it could have so expressly legislated.

*Id. Arlington* did not hold, or even suggest, that a debtor must plead advice of counsel or else waive the defense.

The bankruptcy court in this case relied on *Gotwald*, which concluded that "[a]dvice of counsel' is not really a 'defense' in a § 523(a)(6) proceeding in the sense of being an affirmative defense. Rather, it is a species of evidence that is offered to negate the requisite element of intent under § 523(a)(6)." 488 B.R. 854, 872 (E.D. Pa. Bkr. 2013). *Gotwald*'s reasoning is persuasive, and it applies equally to this case involving § 727. The bankruptcy court appropriately considered Kempff's testimony regarding her discussions with her attorney.

> ## 2. The bankruptcy court's ruling that Kempff did not intend to defraud her creditors by listing her parents as creditors was not clear error.[5]

Farley devotes a substantial portion of his appeal brief to discussing cases rejecting debtors' attempts to excuse their own misconduct by claiming that they were following their attorneys' advice. *See In re Breitling*, 133 F. 146, 149 (7th Cir.

---

[5] It is unnecessary to reach the parties' arguments about whether Kempff "presented or used" a claim within the meaning of § 724(a)(4)(B) because, as the Court is about to discuss, the bankruptcy court's alternative holding on the merits was proper.

1904); *In re Jakovljevic-Ostojic*, 517 B.R. 119, 128 (N.D. Ill. 2014); *In re Stone*, 504 B.R. 908, 913 (Bankr. C.D. Ill. 2014).[6] In *Breitling*, *Jakovljevic-Ostojic*, and *Stone*, the debtors claimed that their attorneys told them to take actions: (1) that inured to their benefit at their creditors' expense; and (2) that no reasonably competent attorney would have advised his or her client to take. *See Breitling*, 133 F. at 150 (claiming an exemption for a substantial receivable when the debtor had already claimed the maximum exemption that the law allowed); *Jakovljevic-Ostojic*, 517 B.R. at 128 (underreporting the amount of her unsecured debt by approximately $860,000; omitting her largest creditors entirely; and listing a monthly mortgage expense of $3,800 when she had stopped making mortgage payments five years before she filed for bankruptcy); *Stone*, 504 B.R. at 914 (claiming an exemption for a tractor valued at between $4,000 and $9,000 "in the aggregated disclosure for miscellaneous household goods, no item over $400, valued together at $2,500").

Farley's reliance on these cases is misplaced. The bankruptcy court found— and Farley has not disputed—that Kempff consistently testified that she considered herself morally (not legally) obligated to repay to her parents the money that they had paid to keep their former son-in-law out of prison. There is no evidence in the

---

[6] Farley also cites *Cannon-Stokes v. Potter*, 453 F.3d 446, 449 (7th Cir. 2006), which held that the debtor was judicially estopped from pursuing an administrative claim that she failed to disclose in her bankruptcy petition. *Cannon-Stokes* is inapposite. Kempff did not argue at trial that she is not bound by the disclosures in her bankruptcy schedules because her lawyer prepared them. *Cf. id.*; *Choice Hotels Int'l, Inc. v. Grover*, 792 F.3d 753, 754 (7th Cir. 2015) ("[L]itigants are bound by the acts and omissions of their chosen agents, including lawyers, and that legal bungling therefore does not justify reopening a judgment."). Rather, she relied on her discussions with her attorney to explain why her schedules omitted (or included) certain information.

record suggesting that the $1.4 million figure was inaccurate, or that Kempff's parents considered it a gift without any expectation of repayment. In fact, Kempff had repaid her parents relatively small amounts on two occasions. *See* R. 21-1 at 8. As to *why* she included the debt on her amended Schedule F, Kempff testified that her attorney told her to do so. R. 18-1 at 67. The bankruptcy court observed Kempff's testimony and concluded that she was a "very credible" witness. *Id*. at 60. Farley argues that the bankruptcy court should have discounted her testimony because her bankruptcy attorney did not testify at the trial, citing *Katsman* and *Breitling*. R. 13 at 36-37. The Court disagrees. The advice that the debtors in *Katsman* and *Breitling* purportedly received from their attorneys was implausible and self-serving. *See Katsman*, 771 F.3d at 1050 (omitting real property, alimony payments, and creditors with material claims); *Breitling*, 133 F. at 150 (vaguely testifying that his attorney told him that he could claim a facially improper exemption). By contrast, there is nothing inherently suspicious about Kempff's testimony that her attorney advised her to amend her bankruptcy schedule to accurately disclose her debt to her parents. Farley knew from his Rule 2004 examinations that neither Kempff nor her parents considered the debt legally enforceable. No reasonable creditor would be discouraged from pressing a legal claim for relief by a debtor's non-binding commitment to repay a debt to her parents. Farley's theory that scheduling the debt was an act of "sophisticated gamesmanship" intended to "discourage" him is far-fetched. R. 13 at 48.

## C.     The Totality of the Evidence

Citing *Katsman*, Farley argues that the overall pattern of false statements in Kempff's disclosures indicate that she recklessly disregarded the truth. 771 F.3d at 1050. In *Katsman*, the debtor's ex-husband's son, who was also one of her creditors, filed an adversary complaint objecting to her discharge under § 727(a)(4)(A). *Id.* The debtor, who was the only witness at trial, admitted that she had "deliberately omitted" creditors from her Schedule F. *Id.* Four of those creditors were friends and family members who had loaned her money while she was going through an acrimonious divorce, and whom she hoped one day to repay. *Id.*[7] She believed— erroneously—that if the debts were discharged she could "never pay them." *Id.* at 1050. She also failed to disclose: (1) the debt she owed the adversary complainant; (2) property that she owned jointly with her ex-husband, "including her home in Indiana and a time share in Las Vegas"; and (3) "alimony payments that she received from her ex." *Id.* The bankruptcy court acknowledged the omissions, but concluded that they were not fraudulent. *Id.* The district court reversed, and the Seventh Circuit affirmed the reversal:

> [The debtor] had excuses for all these omissions, as she did for the failure to list the five creditors (Skavysh, plus the four friends and family members whom she intended to pay back). But given that she was represented by a lawyer who was said by the district judge without contradiction to be competent, it is impossible to take her testimony at face value. It is particularly striking that the lawyer who handled her bankruptcy did not testify at the trial and does not

---

[7] In the district court's opinion reversing the bankruptcy court, the court noted that "several, if not all, of the loans from the four family members and friends were in fact signed notes." *Skavysh v. Katsman*, No. 12 CV 3807, 2013 WL 1339735, at *2 (N.D. Ill. Mar. 28, 2013).

represent her in this court. His absence reinforces the inference that her many false statements bespeak a pattern of reckless indifference to the truth, implying fraudulent intent. The bankruptcy judge missed the pattern.

*Id.* (citation omitted). The bankruptcy court also erred as a matter of law when it concluded that the debtor "couldn't have violated the statute unless she had intended by her false statements to obtain a pecuniary benefit rather than, as appears to be the case, merely to benefit one group of creditors over another for personal reasons." *Id.* Finally, the court rejected the notion that the debtor's deception was immaterial because she would have received a discharge even if she had disclosed all her creditors:

> [S]uch an argument if accepted would mean that a no-asset debtor wouldn't have to so much as submit a Schedule F, because the creditors he would list on it could recover nothing from the estate in bankruptcy—there would be no estate. That can't be right. A bankruptcy proceeding can't be concluded without knowledge of who the debtor's creditors are, unless omitting to mention them would be immaterial, which it would be only if the amount owed them was utterly trivial. That was not the case here.

*Id.* at 1050-51 (citations omitted).

Despite some superficial similarities to this case, *Katsman* is readily distinguishable. The debtor in *Katsman* admitted that she had deliberately omitted debts she owed to friends and family from her bankruptcy schedules in a misguided attempt to favor their claims over those of the adversary complainant ("ex-family, but no friend"). *Id.* at 1050. Her intent to abuse the bankruptcy process was clear, and her testimony about her attorney's advice was uncorroborated *and* implausible. *Id.*

There is no comparable pattern of intentional and reckless conduct in this case. Kempff estimated the value of the gifts that she received from her parents after sitting down with counsel and reviewing "various checks and other information that she had." R. 18-1 at 60. The fact that her estimate was incorrect suggests negligence, at most. *See Skavysh*, 2013 WL 1339735, at *2 ("'[M]ere negligence is not sufficient to deny discharge to debtors'" (quoting *In re Baker*, 205 B.R. 125, 132 (N.D. Ill. Bkr. 1997))); *cf. Jakovljevic-Ostojic*, 517 B.R. at 127-28 (denying discharge where the debtor gave inconsistent testimony about whether she had even reviewed her materially inaccurate bankruptcy schedules before her attorney filed them). Kempff should have amended her bankruptcy schedules to reflect the correct value, but the circumstances do not suggest fraudulent intent (independently or in conjunction with other evidence). The gifts were not an asset available to her creditors, and it is undisputed that the correct value of the gifts did not imperil her eligibility for discharge.

Kempff *did* amend her schedules to disclose the divorce settlement, which is "evidence of innocent intent." *In re Bailey*, 147 B.R. 157, 165 (N.D. Ill. Bankr. N.D. Ill. 1992). Any inference of fraud that the Court might draw from her original error is undermined by the bankruptcy court's findings that: (1) Kempff testified truthfully about her reasons for omitting the debt; and (2) the judgment was worthless. Farley's theory that she intended to deceive her creditors by accurately disclosing her debt to her parents is unpersuasive speculation, and he failed to

satisfy his burden to show that Kempff's jewelry and clothing disclosure was false. Finally, the typo in her Statement of Financial Affairs is just that: a typo.

Viewed cumulatively, the errors in Kempff's bankruptcy schedules do not "bespeak a pattern of reckless indifference to the truth, implying fraudulent intent." *Katsman*, 771 F.3d at 1050. The Court affirms the bankruptcy court's order awarding judgment in Kempff's favor on Farley's § 727(a)(4)(A) and (B) claims.

## CONCLUSION

For the foregoing reasons, the Court affirms the bankruptcy court's judgment.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: September 1, 2015